UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Roanoke Division

**KARSTEN O. ALLEN,**
　　**Plaintiff,**

　　v.

**OFFICER B. SATER, et al.,**
　　**Defendants.**

**MEMORANDUM OPINION**
**Civil Action No. 7:21cv230**
By: Pamela Meade Sargent
United States Magistrate Judge

Plaintiff, Karsten O. Allen, ("Allen"), a Virginia Department of Corrections, ("VDOC"), prisoner formerly incarcerated at Keen Mountain Correctional Center, ("Keen Mountain"), has filed this civil rights action pursuant to 42 U.S.C. §1983, against Officer B. Sater, ("Sater"), Sergeant E. J. Dales, ("Dales"), Officer B. Viars, ("Viars"), Unit Manager Charlotte Shelton, ("Shelton"), Chief of Housing and Programs Robert Whitt, ("Whitt"), Assistant Warden Kevin McCoy, ("McCoy"), Officer R. Daniels, ("Daniels"), Officer J. Matney, ("Matney"), Officer B. Hurley, ("Hurley"), Officer Hess, ("Hess"), Sergeant McCowan, ("McCowan"), Institutional Hearing Officer T. Lowe,, ("Lowe"), Unit Manager Larry Fields, ("Fields"), Warden Rodney Younce, ("Younce"), and Regional Administrator Carl Manis, ("Manis"), alleging that his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution were violated. This case is before the court on the defendants' motion to dismiss, (Docket Item No. 28) ("Motion"). For the reasons stated below, the Motion will be granted, and Allen's claims will be dismissed.

I.  Facts

In his Complaint, (Docket Item No. 1), Allen seeks compensatory and punitive damages, alleging that the defendants violated his rights under the Eighth and Fourteenth Amendments. On November 7, 2020, Allen alleges, he was returned to Keen Mountain after an off-site medical appointment and required to quarantine for 14 days due to the Covid-19 pandemic in Housing Unit C-3, which was designated a "yellow" zone and used for precautionary quarantine. (Complaint at 3.) In this housing status, inmates were allowed out of their cells three times a week for unescorted showers and two times a week for unescorted 20-minute telephone calls. Otherwise, inmates were confined to their cells, but they were allowed to possess personal property. Around 9 p.m. on November 7, Dales, Viars and another unnamed correctional officer came to Allen's cell and ordered him to step out and place his hands behind his back to be restrained. These officers took Allen to the vestibule where Dales told Allen that the booth officer reported that he had "directed a lewd act toward her." (Complaint at 3.) Allen denied the allegation, and Dales responded, "Well I can't let you go back in there [Pod C-3]." (Complaint at 3.) Allen alleges that, when Dales learned that Allen was on a 14-day precautionary quarantine, Dales ordered the officers to take Allen to the C-1 Housing Unit for disciplinary segregation, which was designated a "red" zone for inmates testing positive for Covid-19 or who were showing symptoms or were deemed high risk of contracting Covid-19. (Complaint at 3.)

On November 8, 2020, Allen was awakened from sleep at around 10 p.m. by Viars, who served Allen with a Disciplinary Offense Report for the alleged lewd act. When Allen refused to take the penalty offer, Allen alleges, Viars argued with Allen for several minutes "attempting to convince him to take the plea offer making such

statements as 'There's no need in going to the hearing your [sic] going to get found, guilty anyway, You can't beat that charge' and 'If you go to the hearing your [sic] going to get a $15 penalty you might as well just take this.'" (Complaint at 3.) Viars then requested that Allen sign a receipt stating that he had received copies of the charge and penalty offer, but he said he would return later with copies of these documents. Allen refused to sign the receipt, saying he would sign when Viars brought him copies of the documents. Viars then left, and he never returned with copies of the documents. On November 9 and 16, Allen sent requests to Institutional Hearing Officer, ("IHO"), Lowe for a copy of the Disciplinary Offense Report, ("DOR"). These requests were not answered.

On November 10, 2020, Allen was called to an Internal Classification Authority, ("ICA"), hearing for the alleged offense. According to Allen's Complaint, the ICA hearing was used to determine an inmate's status and was conducted by the Multi-Disciplinary Team, ("MDT"), and included the Chief of Housing and Programs, ("CHAP"), Whitt and Building C Unit Manager Shelton. The MDT recommended that Allen be removed from General Detention and be placed in the Restrictive Housing Unit, ("RHU"). Allen alleges the "rationale for this decision was stated as 'MDT recommends assignment to RHU based on recent disruptive behavior that resulted in inmate [receiving] a 137A infraction'." (Complaint at 4.) Allen attached a copy of the Institutional Classification Authority Hearing report for this hearing as Exhibit A to his Complaint. (Docket Item No. 1-1 at 1.) The ICA's decision to place Allen in the RHU was reviewed and approved by Assistant Warden McCoy. Allen alleges that, in RHU, he was handcuffed whenever he exited his cell, and he was required to complete "writing assignments or fact further disciplinary action." (Complaint at 4.)

Allen alleges that, while housed in the RHU in the C-1 Pod he was exposed to at least one inmate known to have Covid-19. Allen alleges this unnamed inmate was experiencing Covid-19 symptoms when he was placed in the C-1 Pod, and the prison issued a memorandum confirming that the inmate was positive for Covid-19 on November 18, 2020. Allen alleges that, despite having an inmate with Covid-19 housed in the C-1 Pod, officers, nurses and other prison staff members did not decontaminate themselves after interaction with the Covid-19 positive inmate and before interacting with Allen. He states that the only preventative measure offered to inmates in the C-1 Pod at that time was the inmates were "confined to their cells" and "offered optional use of sanitizing spray periodically." (Complaint at 4.) Allen alleges that the inmate showers were cleaned nightly but not between each inmate's use.

Allen states that he was moved to the C-2 Pod on December 2, 2020. On the morning of December 3, 2020, at approximately 3 a.m., Allen complained to Officer Matney and Officer Daniels that he was experiencing chest pain. Officer Matney told him to "lay down." (Complaint at 5.) Allen alleges he continued to complain to Daniels, who ignored his complaints of chest pain. Allen said that he pressed the emergency button in his cell, and Officers Matney and Daniels returned to his cell with Sgt. McClain, yet they all refused to obtain any medical attention for Allen. Allen states that he continued to press the emergency button, but it was ignored.

Allen states that, at around 7 a.m., Nurse Saucier was in the pod conducting pill call. When Saucier arrived at his cell door, Allen attempted to explain he was experiencing chest pain, but Sgt. McCowan intervened demanding that, if Allen did not simply take his medication and allow Saucier to move on, McCowan would shut the tray slot in Allen's cell door and instruct Saucier to write that Allen has refused

his medication. Allen states that he protested that McCowan could not prevent him from seeking medical attention. He alleges that McCowan responded, "If you have an issue you can tell me." (Complaint at 5.) McCowan then instructed Saucier to move on to the next cell, which she did. Allen complained to McCowan that he needed medical attention for chest pain. McCowan responded that he was busy doing pill call, and Allen needed to wait until he finished pill call. Allen continued to press the emergency button, which went unanswered. Shortly thereafter, Officer Hess came to Allen's cell door "aggressively demanding" that Allen stop pressing the emergency button. (Complaint at 5.) Allen described his chest pain and need for medical attention to Hess, and Hess responded that, if Allen could press the button, then there was nothing wrong. Allen alleges that Hess became belligerent, shouting, "You're a little bitch!" "Stop pressing that fucking button!" (Complaint at 5.) When Allen continued to press the emergency button, Officer Hess began making threats that if Allen did not stop pressing the emergency button, he would "beat [plaintiff's] … ass." (Complaint at 5.) Hess said that he did not care about getting in trouble because it was his last day on the job. Hess then contacted McCowan on the radio, stating, "I got this guy Allen pressing the button over and over." (Complaint at 5.) Hess then explained that Allen was complaining of chest pain, but he did not believe that anything was wrong because Allen was standing. McCowan asked if Allen was sweating, to which Hess responded that he was not, then added that Allen was wrapped up in a blanket like he was about to go to a religious service or something. McCowan responded that, if Allen was not sweating, then Allen was not having a heart attack. McCowan told Hess to tell Allen to lie down, and when he passed out, they would come get him. Hess then asked Allen if he heard McCowan's statement, and said, "Lay down and die first." (Complaint at 5.)

    Allen alleges that Officer Hurley then joined Hess at his cell door and began

threatening to charge Allen with a disciplinary offense if he did not stop pressing the emergency button. Allen asserted that he was experiencing chest pain and that it was his right to seek medical assistance. Hurley stated, "I don't care what right you have. I'm giving you an order to stop pressing that button or I'm going to write you a hundred series [major infraction]." (Complaint at 6.) When Allen pressed the emergency button again, Hurley pulled Allen's face card down from above his cell door and took it upstairs to write a charge.

      Allen alleges that, later that day around 11 a.m., he spoke with Lt. Kole about the officers' conduct in response to his request for medical attention. Lt. Kole then gave an order for McCowan and Hess to take Allen to Medical. Once at Medical, Allen explained to Nurses Compton and Saucier that he had been having chest pain, felt sick and had been exposed to Covid-19 during his confinement in the C-1 Pod. The nurses performed an electrocardiogram, ("EKG"), but performed no other tests. Allen alleges he was sent back to his cell to "endure his condition." (Complaint at 6.) Allen alleged that he submitted a sick call request, which went unanswered. Allen remained in the cell 209 in the C-2 Pod from December 2 to December 8, 2020. During this time, he alleges that the temperature outside the prison dropped to below freezing. He said that the heat in his cell was not working and, instead, the vent was emitting "sharply cold air." (Complaint at 6.) Allen alleges that the "combination of the outside temperatures and the cold air from the vent amount to essentially torture." (Complaint at 6.) Allen alleges that, despite wrapping himself in a thin blanket, he spent the majority of these days shivering, which was extreme at night. Allen said that he and the inmate in cell 208 constantly told the staff that the heat was not working, including telling Unit Manager Shelton and Assistant Warden McCoy, several watch commanders, Lt. Kole, Major Owens and the floor officers. Allen alleges the heat was never fixed.

Allen alleges that, on December 9, 2020, he was called to the hearing for the disciplinary infraction. He said he protested holding the hearing before he was served with written notice of the offense. Allen alleges that IHO Lowe stated that, Allen's refusal to sign the receipt that he had received the copies, showed that he did receive the copies, and Lowe continued with the hearing. Allen requested that Lowe provide him with a copy of the DOR, but Lowe refused. Lowe then proceeded with the hearing, which was conducted by telephone. Lowe read the description of the offense and asked Officer Sater if she wrote the DOR, and she responded, "yes." (Complaint at 6.) Lowe then allowed Allen to question Sater. Allen asked Sater if they had ever had a conversation about the offense, to which Sater responded, "no." (Complaint at 6.) Allen then asserted that he could not defend himself because he could not remember the description of the offense from Lowe reading it over the telephone line. Lowe then asked Allen if he had masturbated toward Sater, to which Allen responded, "no." (Complaint at 7.) Lowe then found Allen guilty of the offense and set the penalty at a $15 fine. Allen attached the Notice of Restitution/Loss of Pay/Deduction of Fine form imposing the $15 fine as Exhibit B to his Complaint. (Docket Item No. 1-1 at 2.) Allen said that this disciplinary conviction was reviewed and upheld by Unit Manager Larry Fields. Allen attached a copy of the DOR showing his conviction, imposition of the $15 fine and Fields's institutional review and approval of the outcome as Exhibit C to his Complaint. (Docket Item No. 1-1 at 3.)

Allen alleges that he appealed this conviction to Warden Younce, who refused to acknowledge the procedural violations and upheld his conviction. Allen attached a copy of Younce's December 28, 2020, Disciplinary Hearing Appeal Response approving his conviction as Exhibit D to his Complaint. (Docket Item No. 1-1 at 4-5.) Allen then appealed his conviction to Regional Administrator Manis, who also

upheld his conviction. Allen attached a March 31, 2021, letter, showing that this conviction was upheld at the regional level on March 29, 2021, as Exhibit E to his Complaint. (Docket Item No. 1-1 at 6.)

Allen alleges that Sater violated his 14th Amendment right to due process by filing a false disciplinary offense report against him. He alleges that Dales and Viars violated his Eighth Amendment right to be free from cruel and unusual punishment by placing him in the C-1 Pod designated for inmates testing positive for Covid-19 or showing symptoms of Covid-19. Allen alleges that Viars and Lowe violated his 14th Amendment right to due process by refusing to provide him with a written copy of the disciplinary offense report written against him. He also asserts that his placement in RHU "without any evidence of guilt" by Shelton, Whitt and McCoy violated his 14th Amendment right to due process. Allen alleges that his placement in the RHU under "conditions atypical and a significant hardship to the ordinary incidents of prison life," confinement with a Covid-19 positive inmate in a cell while temperatures were sub-freezing with the air conditioning on and being denied medical treatment and forced to endure chest pain was "unconstitutional." (Complaint at 7-8.) Allen alleges that the refusal by Daniels, Matney, Hess, McCowan and Hurley to obtain medical assistance for his complaints of chest pain constituted deliberate indifference to a serious medical need in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Allen alleges that the failure to give an adequate reason for the decision by Lowe, and the review and approval of his conviction by Fields, Younce and Manis, violated his 14th Amendment right to due process.

Allen alleges that he attempted to resolve these issues administratively by using the prison's Appeal and Grievance Procedures, and he states, "see exhibits."

(Complain at 9.) However, there are no exhibits to the Complaint that address any attempt to use the prison's administrative remedies.

Allen seeks compensatory damages against all defendants and punitive damages against defendants Sater, Dales, Viars, Shelton, Whitt, McCoy, Daniels, Matney, Hess, McCowan and Hurley.

## II. Analysis

In the Motion, the defendants argue that Allen's Complaint should be dismissed under Federal Rules of Civil Procedure Rule 12(b)(6) for failing to state a claim upon which relief may be granted. A motion to dismiss under Rule 12(b)(6) examines the legal sufficiency of the facts alleged on the face of a plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In considering a motion to dismiss, all well-pleaded factual allegations contained in a complaint are to be taken as true and viewed in the light most favorable to the plaintiff. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and it must allege facts specific enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Dismissal also may be appropriate where the complaint contains a detailed description of underlying facts, which fail to state a viable claim. *See Estelle v. Gamble*, 429 U.S. 97, 106-08 (1976).

Furthermore, the court is required to liberally construe complaints filed by plaintiffs proceeding pro se. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Pro se complaints are held to a less stringent standard than those drafted by attorneys. *See*

*Erickson,* 551 U.S. at 94; *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). This requirement of liberal construction does not mean, however, that the court should ignore a clear failure to plead facts which set forth a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

In this case, Allen claims that his Fourteenth Amendment right to due process was violated. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).  "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  If a prisoner alleges deprivation of a protected liberty or property interest, then the court will examine the sufficiency of the process surrounding the deprivation of that interest. *See Prieto*, 780 F.3d at 248.

The defendants argue that Allen has failed to state a viable claim for procedural due process because the imposition of a small monetary fine did not deprive him of a protected interest. As a result of his disciplinary offense conviction, Allen alleges that he received a $15 fine. Numerous cases of this court have held that small monetary fines are not constitutionally protected interests under the Due Process Clause. *See Hoglan v. Mathena,* 2022 WL 625086, at *10 (W.D. Va. Mar. 3, 2022); *Graham v. Stallard,* 2020 WL 5778790, at *19 (W.D. Va. Sept. 28, 2020) ($10 fine insufficient to trigger constitutional due process protections); *Roscoe v. Mullins*, 2019 WL 4280057, at *3 (W.D. Va. Sept. 10, 2019) ($15 fine did not implicate due process rights), aff'd on other grounds, 828 F. App'x 921 (4th Cir. 2020); *Ferguson v. Messer*, 2017 WL 1200915, at *8 (W.D. Va. Mar. 30, 2017)

(three $12 fines did not give rise to a protected property interest); *Bratcher v. Mathena*, 2016 WL 4250500, at *1 (W.D. Va. Aug. 10, 2016) ($12 fine did not implicate loss of a protected property interest). Other cases from this court, however, have recognized that a monetary fine imposed deprives a prisoner of a protected property interest. *See Bowling v. Clarke*, 2021 WL 440794, at *3 (Feb. 8, 2021) ($15 fine deprived inmate of a protected property interest); *Muhammad v. Commonwealth*, 2016 WL 1068019, at *15 (W.D. Va. Feb. 1, 2016) ($12 fine implicated a protected property interest under the Due Process Clause) (citing *Burks v. Pate*, 119 F. App'x 447, 450 (4th Cir. 2005) ("A prisoner has a protected property interest in his prison trust account"). While the Fourth Circuit has not yet spoken directly on this issue, some courts have questioned whether the analysis of *Sandin v. Conner*, 515 U.S. 472, 484 (1995), requiring that the particular hardship be "atypical and significant" to create a constitutionally protected interest, applies in the context of deprivation of property, given that *Sandin* addressed whether a particular deprivation implicated a liberty interest. *See Graham*, 2020 WL 5778790, at *19 n.27. The Tenth and Sixth Circuits have applied *Sandin* in the context of property rights, *see Steffey v. Orman*, 461 F.3d 1218, 1222 (10th Cir. 2006); *McMillan v. Fielding*, 136 F. App'x 818, 820 (6th Cir. 2005), but the Third and Fifth Circuits have not, *see Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 293 (3rd Cir. 2008); *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995). The Fourth Circuit, in an unpublished opinion in *Backus v. Ward*, 151 F.3d 1028 (Table), 1998 WL 372377, at *1 (4th Cir. 1998), did apply *Sandin* to conclude that a prisoner "did not have a constitutionally protected liberty or property interest in his prison job."

The court, however, does not need to resolve this split in authority to rule in this case. Because of this split of authority, I hold that the defendants are entitled to qualified immunity on Allen's due process claims. Qualified immunity "shields

government officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982)).

A claim of qualified immunity is evaluated using a three-step analysis. First, the court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court must "inquire whether at the time of the alleged violation [the right] was clearly established." *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips J., concurring). Third, the court must determine whether a "reasonable person in the official's position would have known that his conduct would violate that right." *Collinson,* 895 F.2d at 998 (Phillips J., concurring). In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that the sequential inquiry of *Saucier* is often appropriate, but not mandatory. Instead, the Court held that the judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *See Pearson*, 555 U.S. at 236. A right is clearly established when a legal question has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state . . . ." *Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980). As set out above, whether small monetary fines are constitutionally protected interests under the Due Process Clause is not clearly established in this circuit. Therefore, I find that the defendants are entitled to qualified immunity on Allen's due process claims.

Even if the court were to find that the prison disciplinary proceeding at issue

here implicated an interest protected by due process, Allen's due process claims still should be dismissed. A state prisoner's claim for damages based on an alleged due process violation because he was improperly convicted of a prison disciplinary offense cannot proceed if his disciplinary offense conviction has not been set aside. *See Harris v. Martin*, 2015 WL 66513, at *6-7 (S.D. W.Va. Jan. 5, 2015) (citing *Edwards v. Balisok*, 520 U.S. 641, 648 (1997); *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)); *see also Thompson v. Clarke*, 2018 WL 4764294, at *4 (W.D. Va. Sept. 30, 2018); *Mukuria v. Mullins*, 2015 WL 6958343, at *2 (W.D. Va. Nov. 10, 2015). A finding that the defendants deprived Allen of due process protections during a disciplinary proceeding "would necessarily imply the invalidity of the resulting disciplinary conviction and penalties." *Mukuria*, 2015 WL 6958343, at *2. Allen's Complaint alleges that he was convicted of the disciplinary offense, and his disciplinary conviction was upheld on appeal. Without any information that this disciplinary conviction was set aside, Allen's §1983 due process claims are barred under *Heck*. *See Goodwin v. Coley*, 2019 WL 2194139, at *2 (E.D. N.C. Apr. 22, 2019).

Furthermore, Allen's claim that Sater violated his due process rights by filing a false disciplinary charge against him fails to state a cognizable §1983 claim. Falsely accusing an inmate of misconduct does not violate a right secured by the Constitution or the laws of the United States. *See Cole v. Holloway*, 631 F. App'x 185, 186 (4th Cir. 2016).

Allen's Complaint also fails to state a claim for violation of his due process rights against Fields, Younce and Manis. Allen claims that Fields violated his due process rights by reviewing and approving the disciplinary offense report for the charge written by Sater. Allen claims that Younce and Manis violated his due

process rights by reviewing and approving his disciplinary conviction. Liability under § 1983 lies only where it is shown that an official acted personally in the deprivation of the plaintiff's rights. *See Trulock*, 275 F.3d at 402; *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). In an unpublished opinion, this court has held that upholding an inmate's disciplinary offense conviction does not give rise to an independent due process violation. *See Roscoe v. Kiser*, 2019 WL 6270240, at *7 (W.D. Va. Nov. 22, 2019). The doctrine of *respondeat superior* is not applicable in § 1983 suits. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Allen's Complaint also fails to state a claim for violation of his due process rights against Shelton, Whitt and McCoy for committing him to the RHU following an ICA hearing without any evidence of guilt. To the extent that Allen is claiming that his confinement in disciplinary segregation violated his due process rights, the Supreme Court held in *Sandin* that "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." 515 U.S. at 486. To the extent that Allen is claiming that a change in his classification resulting from his ICA hearing violated his due process rights, this court has held that Virginia prisoners have no liberty interest in any particular classification, even if it affects their good conduct time earning rate. *See Sprately v. Mabrey*, 2021 WL 504829, at *3 (W.D. Va. Feb. 10, 2021). The Fourth Circuit also has so held, although in an unpublished decision. *See West v. Angelone*, 165 F.3d 22, 1998 WL 746138, at *1 (4th Cir. 1998) ("Inmates have no protected liberty interest in remaining in or being assigned to a particular good conduct allowance level…."). Allen's Complaint, however, does not allege that the change in his classification affected his good conduct time earning rate.

Allen's Complaint also alleges that various defendants violated his Eighth

Amendment right to be free from cruel and unusual punishment. The Eighth Amendment to the U.S. Constitution protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This includes a requirement that a state provide medical care to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). For a prisoner to prevail on a constitutional claim for denial of medical care, he must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. In essence, treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). To prevail on a claim of a violation of the Eighth Amendment based on conditions of confinement, a prisoner "must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)) (internal quotation marks omitted).

To state a cognizable claim for denial of medical care under the Eighth Amendment, a plaintiff must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need. *See Rush v. Vandevander*, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008) (citing *Estelle*, 429 U.S. at 104) With regard to a prisoner's medical treatment, a prison official is deliberately indifferent if he knows of, but disregards, an inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994). Liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a serious

medical need. It is not sufficient that the official should have recognized it; the official must actually have known of it. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush*, 2008 WL 495651, at *1. Second, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001). Therefore, to adequately plead a claim for deliberate indifference, a plaintiff must plead facts that show the defendants had actual knowledge of and disregard for an objectively serious medical need. *See Rush*, 2008 WL 495651, at *1 (citing *Farmer*, 511 U.S. 825); *see also Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997).

The same is true regarding a claim of deliberate indifference to the dangers posed by a condition of confinement. To amount to deliberate indifference, a public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer*, 511 U.S. at 837. "[D]eliberate indifference entails something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. To adequately plead a claim for violation of the Eighth Amendment based on cruel and unusual prison living conditions, a plaintiff must plead "facts showing that: (1) objectively, the deprivation was sufficiently serious,

in that the challenged, official acts caused denial of 'the minimal civilized measure of life's necessities'; and (2) subjectively, the defendant prison officials acted with 'deliberate indifference to inmate health or safety.' *Farmer*, 511 U.S. at 834." *Ross v. Russell*, 2022 WL 767093, at *10 (W.D. Va. Mar. 14, 2022). To show that the deprivation was sufficiently serious, the plaintiff must plead facts showing "'significant physical or emotional harm, or a grave risk of such harm,' resulting from the challenged conditions." *Ross*, 2022 WL 767093, at *10 (quoting *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995)). To show deliberate indifference, the plaintiff must plead facts showing that the defendant prison officials actually knew of and disregarded the serious risk of harm posed by the conditions. *See Ross*, 2022 WL 767093, at *10.

Turning to the facts of Allen's claims, Allen claims that his Eighth Amendment rights were violated by various defendants' deliberate indifference to his serious medical needs and to the dangers posed by his conditions of confinement. Regarding his claim that his serious medical needs were ignored, Allen alleges that he began experiencing "chest pain" and complained to correctional officers starting at 3 a.m. on December 3, 2020. Allen alleges that he continued to complain and to seek medical attention from various correctional officials and medical staff until Lt. Kole, at approximately 11 a.m., ordered that he be taken to the Medical Department where an EKG was performed, and he was returned to his cell without any treatment to "endure his condition," (Complaint at 6). He alleges that he submitted a sick call request that went unanswered. While requesting medical treatment, Allen alleges, certain correctional officials verbally harassed and even threatened him to quit seeking medical attention. Other than chest pain, Allen does not allege that he suffered any other symptoms, such as difficulty breathing, racing heart rate, sweating or lightheadedness. At another point in his Complaint, Allen states that he was

"forced to endure serious chest pain," (Complaint at 8), but he does not otherwise describe the pain, and he does not state how long the pain lasted. Allen also does not allege that he was ever diagnosed with a medical condition needing medical attention or that he suffered any injury based on a lack of medical treatment for his complaints of chest pain. Based on the above, the court holds that Allen's Complaint fails to allege that his complaints of chest pain rise to the level of a serious medical need.

Regarding Allen's claim based on his conditions of confinement, Allen alleges that, from November 7 to December 2, 2022, he was placed in the C-1 Housing Unit, which was designated a "red" zone for inmates testing positive for Covid-19 or who were showing symptoms or were deemed high risk of contracting Covid-19. Allen alleges that, while housed in the RHU in the C-1 Pod, he was exposed to at least one inmate known to have Covid-19 when that inmate also was placed in the C-1 Pod. Allen alleges that, despite having an inmate with Covid-19 housed in the C-1 Pod, officers, nurses and other prison staff members did not decontaminate themselves after interaction with the Covid-19 positive inmate and before interacting with Allen. The only preventative measure offered to inmates in the C-1 Pod, Allen alleges, was "optional use of sanitizing spray periodically." (Complaint at 4.) Allen also alleges that the inmate showers were cleaned nightly but not between each inmate's use. Allen also alleges that he was placed in a cell from December 2 to 8, 2020, with no heat and with the ventilation system blowing cold air. Allen does not allege that he or any other C-1 Pod inmates contracted Covid-19 while housed in the C-1 Pod with the one ill inmate, nor does he allege that he was injured or became sick while housed in the C-1 or the C-2 Pod. In fact, Allen does not allege that he had any direct contact with the one confirmed Covid-19 positive inmate housed in the C-1 Pod. Allen also alleges that the cold temperature in his C-2 Pod cell "amounted essentially to torture" and that he "spent the majority

of the day shivering which was extreme at night." (Complaint at 6.)

Based on these allegations, the court holds that Allen has not sufficiently pleaded a substantial risk of serious harm. No doubt, exposure to cold temperatures for six days may be uncomfortable. Nonetheless, Allen has not pleaded allegations showing that the conditions of his confinement in his C-2 cell were sufficiently serious to cause him significant physical or emotional harm, or a grave risk of such harm. Regarding Allen's allegations of exposure to Covid-19, this court and others have found that, under certain circumstances, a risk of exposure to Covid-19 or other serious infectious disease can satisfy the objective element of an Eighth Amendment claim, *see Ross,* 2022 WL 767093, at *10. I do not find, however, that the allegations in Allen's Complaint rise to the level of a substantial risk of serious harm. Allen has not alleged that he suffers from a preexisting health condition or is of an age that makes him more susceptible to acquire Covid-19 or to suffer a more severe case of Covid-19. *See Ross,* 2022 WL 767093, at *10. Further, Allen alleges that the inmates in the C-1 Pod were all locked down in their own cells during his time in the pod, limiting the inmates' person-to-person contact. *See Wilson v. Williams*, 961 F.3d 829, 834-35 (6th Cir. 2020) ("dorm-style" housing where inmates remain in close proximity created heightened risk of disease spread). Allen also alleges that the inmates were provided with sanitizing spray periodically. Furthermore, Allen has not alleged any widespread outbreak of Covid-19 in the C-1 Pod, in that he alleges only one confirmed case during his time in the pod. *See Wilson*, 961 F.3d at 840 (59 inmate cases, 46 staff cases and six Covid-19 deaths at prison created obvious risk of harm).

Having found that Allen's allegations do not establish a serious medical need or a substantial risk of serious harm, his allegations cannot establish that his

treatment and/or conditions of confinement at the hands of the defendants amounted to deliberate indifference, in that he cannot show that the defendants subjectively knew that they posed any such risk. Even if the court were to find that the conditions of Allen's confinement in the C-1 Pod created a substantial risk of serious harm, Allen's allegations do not establish that any of the defendant who placed him there actually knew of and disregarded the serious risk of harm posed by the conditions. He alleges that defendants Dales and Viars violated his Eighth Amendment right to be free from cruel and unusual punishment by placing him in the C-1 Pod, designated for inmates testing positive for Covid-19 or showing symptoms of Covid-19. Allen's Complaint, however, makes no allegation that Viars took any action resulting in his transfer to the C-1 Pod. Instead, it alleges that Dales ordered his transfer to the C-1 Pod only after learning that Allen was completing a 14-day quarantine period. Allen makes no allegation that either Viars or Dales was responsible for, or even knew of, the conditions in the C-1 Pod.

Based on the above-stated reasons, I will grant the Motion and dismiss Allen's claims against the defendants without prejudice.

An appropriate Order will be entered.

**ENTERED**: July 18, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE